Good morning, Judge Wardlaw, Judge Kaczynski, Judge Gould in Seattle. Your Honors, in preparation, my name is Lew Franicki. I represent the plaintiff appellant and cross appellee. In this case, in preparation for our discussion here today, it became absolutely obvious to me, and it's obviously my job to convince you, that the law is absolutely settled in California that comparative fault does not apply to breach of express warranty. In 35 years... You've had a California Supreme Court decision that we haven't been cited? You found one of those? There is no California decision that's specifically on all fours. California Supreme Court decision on point? No. Then the law isn't settled. So whatever your personal conviction may be, if you don't have a California Supreme Court decision directly on point, then all you're doing is arguing. I have... If you have one of those, then, of course, we can go home, you know. I'd be happy to break for lunch early. I have several Supreme Court cases which talk about it. Do they still deal with this question? In oblique ways, yes. I would cite to you the Robinson case, the U.N.S.C. case. That's a long way of saying no. Not exactly. The reason is, is that the Lee case and the Daley case, which was decided in 1975 and 1978 respectively, both applied comparative fault to negligence and strict liability and strict liability only. And the Daley case had every opportunity to include breach of express warranty. It did not. Five separate courts of appeals cases in California all talk about how breach of express warranty is a primary assumption of the risk, knowing primary assumption of the risk will void a breach of express warranty, but nothing else, not comparative fault. I cite to you the Knight v. Jewett case, the Milwaukee case, the Schaeffer case, the Ehrlich case, and also the Robinson and Jimenez cases. Well, won't you give me your strongest case? Let's talk about that. What do you think is your slam-bang strongest case? We bank on the basic premise of the difference. No, no. I asked you for a case. I'm sorry. Say again. Give me a specific case, your strongest. Milwaukee. Milwaukee. Milwaukee and Schaeffer. Well, no. That's two cases. Which one do you want to talk about? I would like to talk in sequence, Milwaukee and Schaeffer, if that is agreeable. Milwaukee is a scholarly evaluation of the law in California of the difference between a preexisting legal duty for which comparative fault applies, such as negligence and strict liability. However, Milwaukee also says, and very clearly, that if there is no preexisting duty a la express warranty, a duty that is incurred by the manufacturer independently, there is no comparative fault. You still have breach of a primary express, correction, primary assumption of the risk, which will void an express warranty. That is a very scholarly evaluation. And unfortunately, the case was then remanded back down to the lower court. But Schaeffer, decided by two of the same justices who decided Milwaukee, specifically said, in a pure express warranty case, that comparative fault does not apply to express warranty. In the Schaeffer case, it was a question of fault. It was just one sentence, right? It's not just one sentence. It's the specific holding of the case that did not apply, in that case, 5 percent comparative fault against the manufacturer. In that case, it was a breach of this. And that's not a specific case. There's been a lot of California Supreme Court law since then. That is correct. But then there's other Supreme Court cases. So I'm just so perplexed why nobody cited Kransko v. Empire Surplus Lines, which is not the case. I'm sorry, Your Honor. Which case? Kransko. Oh, the Kransko case. Yes. v. Empire Surplus Lines, which elaborates about the tort contract distinction and the application of the comparative fault analysis. The specific class of the Kransko case? It's a 2000 California Supreme Court decision. The Supreme Court decision is that I am more familiar with, if you'll pardon me for answering it this way. That's what I was saying. I'm just perplexed no one's talking about that case, which goes on at length about, I mean, it's a scholarly discussion about torts, nature of torts versus the nature of contracts, and why comparative fault doesn't apply to contractual relationships, which I understand under California law is where the breach of an express warranty would lie, as a contract issue, not as a tort issue. Correct. Correct. And that's why the Jimenez case and the Robinson case talk about how the economic loss rule is in place to prevent the merger of tort and contract remedies. And those are two Supreme Court cases that talk specifically about that. In fact, the Jimenez case says it's not arbitrary that there's a difference between tort and preexisting legal duties set forth by statute and or case law versus breach of a contract express warranty. I'm curious as to why the case went to the jury on all of these claims, both the tort and the express and the contractual claims, because we end up with a host of findings by the jury that ultimately throws out all the tort claims, leaves you only with the express warranty claim, which I question whether that's even viable because of the issue of privity. Judge Wardlaw, the privity is not involved in express warranty as found by the California Supreme Court case of Seeley. Privity is not required for express warranty. That was proven. That's briefed in our briefs clearly. And also, if you look at it, we had proven that. The jury found it in question number 25 of the special verdict that said specifically that the DASO in this case had, because of its continuous involvement with the plaintiff, had, in fact, established privity. So not only is it both legal and not. Pardon me? The jury found?  The jury found in question number 25 of the verdict that the involvements – I beg your pardon. Jury 28. I beg your pardon, not 25. 28 specifically found that there was sufficient involvement by DASO and continual. Where is that in the excerpt? I'm sorry? Where is that in the excerpt? I'm sorry. I'm losing my last word. Where is it in the excerpt? It is in the excerpt of record under the special verdict form, and I don't have a cite to it specifically. It is in the briefs. I have the special verdict form, a copy of it. Where is it in the excerpt? Where is what? In the excerpt. Where is it? I don't have that cite in front of me. You don't have the excerpt in front of you? No. It's obviously – it's in the briefs. It's cited to the special verdict form, and then it is also – Look at it in the briefs and tell me where it is. Counsel, could you maybe find – could you find that citation before you make it? Yes. I can – Is there no argument to give it to the court? Yes. I'd like to have it now. Just go get your brief, get your brief, and give me a citation to the excerpt. Do you have the excerpt? It would be in AER. The sequence would be approximately AER 50 through 54, which I believe addresses and is a copy of the special verdict form. And if you look then at question 28. Okay. I have question 28. Yeah. It's on page 54 of the excerpt. Yeah. Where the jury found, of course, that because of the engagement by Dassault with the plaintiff that Dassault was functionally in the position of a direct seller to the plaintiff. What is there to support that finding? Well, we had testimony by not only Dassault, a vice president of marketing, who said that we continuously support used aircraft, which they did, but we also had the testimony of the head mechanic for the plaintiff who had and subscribed to the various websites as well as receiving continuous upgrades, amendments to the manuals, continuous conversation with them. It is one of those support mechanisms that large manufacturers have for, in this case, used aircraft where there is continuous subscriptions, et cetera. That applies to all sorts of things out there, cars, washing machines. Not necessarily. But in airplanes, it's far more complicated and far more. Well, what is it other than the fact that they provide, what, repair, support? I don't know what it is. What is it that they provide? When they say support, what does that mean? The support means that they will supply parts. They will supply engineering consultation. There's a specific website that you go to that you subscribe to, and you can only get into it if you subscribe to it and pay a rather hefty fee, at which point you then have access to Dassault's engineering, parts people, consultations, et cetera. Similarly, they also continuously, when you subscribe... But you don't have to be an original purchaser to subscribe to it, right? That's correct. So how does that support the finding that this puts them in the functional position of direct seller? Because that's precisely what they were doing. The policy of Dassault is to support used aircraft. The manifestation of that support is through not only the website but also the selling of parts.  Well, it's for cars. You can buy used cars for the... You can buy parts from the dealer for your used car, even if you buy it from a second or third party, right? It's true of most equipment that you buy on the market. If you... The manufacturer will sell spare parts to anybody. You don't even have to own it. You know, if you just want to buy a spare part, they'll sell it to you. If you just want to use it for some other project, they'll be happy to sell it to you. What does that have... How does that support the idea of the functional position of the direct seller? Well, for two reasons. First of all, I want to not lose sight of the fact that privity is not required on express warranty. However, to answer your question more directly, the fact is that in aviation, the criteria, as we're looking at, is how much involvement does the manufacturer have with, in this case, a used airplane manufacturer... Airplane purchaser? If that is the criteria, then the jury hears the evidence of whether or not there has been that involvement. If there has been this continuous contact, if there's been direct mailings from Paris, which is, in fact, what happens with the amendments to the manuals that went on for the year prior to this crash that the plaintiff owned the aircraft. If there is a policy on the part of the manufacturer to continuously support these aircraft around the world, which they do, they establish... In fact, they establish up in San Jose a... Let's move on to the next question. Why was there evidence of... What was the evidence of reliance? The pilot... Assuming there was a warranty. The pilot testified, as also cited in the briefs, that they had read the manuals, that they relied on the manuals, that the manuals, as the jury found, did not contain... What would they have found that they should have... What was missing? What was missing? Yes. A chart. The specific item that was really in controversy in this case was that every aircraft, every heavy jet aircraft, has a chart that tells the pilot, given a certain weight and a certain center of gravity location based on that weight, that the horizontal stabilizer must be set at a specific weight. It's only good if you know the center of gravity, and there's uncontradicted evidence in this case that the pilot did not measure the center of gravity. No, that's not correct, Your Honor. There was evidence that he had already made such calculations during the two weeks of training. He knew more or less where it was, but he had had prior experience, which is the fact that... I'm sorry. I thought it was pretty clear that you can only measure the center of gravity once you know the weight of the aircraft and the actual distribution of the weight. He knew the approximate weight. That's what he testified to. He knew that he had had more fuel... But he did not make a calculation after he determined that he had extra fuel. He didn't make a determination of center of gravity after he knew the number of passengers or the weight of the cargo. That is uncontradicted, isn't it? No, Your Honor. This is the way it works. No, excuse me. Did you hear the question? Yes, and I'm trying to answer it under the Federal Aviation Regulation. No, just listen to my question and answer my question. Don't answer something else. Isn't it uncontradicted that he made no calculation of center of gravity after he determined there was extra fuel in the plane, after he determined the weight of the cargo and the passengers? He calculated the weight, the center of gravity he already was aware of by prior calculation. Did you hear my question? I'm going to give you one more chance to answer it. Is it not true that it is uncontradicted that he did not measure the center of gravity after he determined the weight of the airplane? He did not at the time of the filling of the aircraft. That is correct. Okay. Why isn't that a lack of reliance right there? Because, listen. If he had the chart and he doesn't have the center of gravity, he knows he has extra fuel, he knows he has loaded the capacity, he knows he has too much fuel in the plane. He doesn't measure the center of gravity. If he had the chart and he doesn't have the center of gravity, what good would the chart do him? He had already had calculated in the class. Your Honor, when you fly an airplane like this, a heavy jet, there are two ways under two different rules under the Federal Aviation Regulations, either under Part 91 or Part 135. Under Part 91, which is the way this flight was being conducted, the pilot is not required to make an actual calculation of the exact center of gravity at that time if he has already done so previously so that he has the parameters already calculated. It's sort of like already knowing, you know. So what? He's claiming reliance. The claim here is reliance, and he can't rely on an instruction that would have helped him only if he knows the actual center of gravity based on the weight. It wouldn't have done him any good. So I don't see how there can be reliance. But that's the whole issue of the case. The chart wasn't there. Well, yes, that's why we're talking about it, because it is the whole issue of the case. The breach of express warranty was the fact, as in the Howder case, which is also a Supreme Court case. You do have to have reliance, right? Pardon me? You do have to have reliance. We have reliance. No, no, but you do have to have reliance, even if there's express warranty, right? Well, in this case, it's reliance. I'm asking a legal question. He relied on the manual. He relied on the manual. He didn't have anything in it. But you need to have reliance in order to recover. Of course. Okay. So the question is, how could he have reliance when he didn't make the basic measurement that would have made the chart meaningful? Okay. Hypothetically, let's say, if the chart was available, which experienced pilots know it should be available or wasn't, if that's the case, then he would have known that in a forward center of gravity, here's where you have to set the stabilizer. The fact is, is that he had been taught that he could set it in the middle of this green band, and that was fine. And his prior experience of the aircraft was fine. But he had been taught by the SOAR, whatever he was with. By another defendant. And that's the problem with that other defendant. Yeah. But the SOAR didn't teach him that. The SOAR said you've got to measure the center of gravity. And if you have a chart, the chart doesn't make any sense if you don't know where the center of gravity is. Isn't that quite clear from the record? Your Honor, you're still not accepting something the jury did accept, And that is that when a pilot under Part 91 flies an aircraft like this and has already made the calculations that are in his book, that he knows that this is a forward center of gravity, that that would, when he gets the amount of fuel and amount of passengers, he already knows he's going to be at a forward center of gravity. Therefore, had he had the chart, which was warranted that all the information is in there and it wasn't in there, he would have then obviously set it at a better position. I'm sorry. Did he testify that he calculated this based on a forward center of gravity? Yes. Of course he did. He had already done it. I'm sorry. He did say that. I didn't see that. Where is it? It's in the testimony. I'm not sure if we actually cited to it, but I believe it is in the testimony. And I certainly didn't see it. Well, I didn't see it. Is it in fact in the record that he said, yes, I assumed a forward center of gravity? Or I thought there was a forward center of gravity? There was testimony that he had already calculated. No, I'm asking you the question. Did he say, I assumed there was a forward center of gravity? I will give you a maybe because I have to... A maybe doesn't get... 3,000 pages of testimony. What I can say is I know he did testify. Why don't you look it up? In 24 hours you can file a letter telling us where it is. I will. What I will say to you is that it is cited in the briefs that he testified to I relied on the manuals. I read them. I know that you cited that. But saying I relied on the manual may not be enough. It's in fact evidence he had. He had not calculated what he needed to calculate in order to have a reliance on the manual would be meaningful. That's why it matters whether he said, yes, I assumed or I measured a forward center of gravity. And if you think it's in there, you should provide it. Also, Your Honor, it's in there because he knows it. He already had calculated it. What's in his head is not in the record. We can only base things on what's in the record. I know I can cite to you. If I could interject a point. Certainly. I think that the Chief Judge's request for you to provide, you know, the evidence cite in the next period of time would be a big help on this issue. I have a note that at SER 239 and 240 to 241, there's a statement that the captain knew it was toward the center of gravity, toward the forward limits. But I'm not sure which of these sites is the actual page number where that quote is, the towards the forward limits. So maybe you could address that when you provide the answer to the Chief Judge's question. I've got this language noted, quote, toward the forward limits, close quotes, as the captain knowing that about the center of gravity. But I can't tell from my notes whether that's at SER 239 or 240 or 241. And thank you, Judge Gould. Well, that's exactly what I remember. There was questions along these lines with the pilot, Scott Michaels, and that was part of what we were talking about, that he already was aware that it was forward. When you had this amount of fuel and this amount of passengers, that's how pilots operate when they are dealing with aircraft like this. They're not required to do a calculation each time they fly on this particular type of aircraft under these rules, under Part 91. Do you have the excerpts of the record with you? I'm sorry, say again? Do you have the excerpts of the record with you? No, I do not. You came to court without your excerpts of the record? I can get it, of course. You came to court without them? Not the transcript. I came with the briefs. No excerpts of the record? Not the whole excerpt of the record, no. They're like this. I know what they are. Yeah. I did not bring them. But if that, I know we cited in our briefs to the excerpt of the record as Justice Gould has pointed out. I mean, what did you say we're going to talk about today? I'm sorry, Judge Gould was saying something. No, go ahead. I'm sorry. I didn't mean to. Okay. I'm sorry, Judge Kaczynski, did you have another? Can I ask a question? Sure. It's so fundamental, but it's, what exactly is the warranty, the express warranty? Where is what? What exactly is the warranty and where is it? Is the warranty you're relying on that language from an operating manual that says, procedures contains the information necessary for operation of the airplane. This information will enable an operator to obtain an adequate knowledge of the airplane's characteristics normal. Is that what you were contending was breached? AER-171, it is cited in the facts of page seven of our opening brief, where the manual express warranty found by the jury to have been breached is quoted in the middle of our brief. And it says, this operation manual, procedures containing the information necessary for operation of the airplane. This information will enable an operator to attain an adequate knowledge of the airplane, its characteristics, normal, emergency, and abnormal procedures. Why would the manual that was circulated in the U.K. differ from the manual that was circulated in the United States? This manual didn't differ from the one, this is the one in the United States. I know. The difference was the U.K. The U.K. had additional information. It has the chart. At the same time, right? Yes. And that, well, actually it was almost 19 years earlier. That was what part of the problem I think the jury saw very clearly. DASO was aware of the delay in rotation. If you didn't have the stabilizers set correctly at the forward center of gravity location during their initial flight tests, then they were challenged by the United Kingdom who have an independent evaluation to see if you can fly an airplane in the United Kingdom. And the United Kingdom said, we want a chart. A chart was prepared by DASO back in 1993, I believe it was. And when they did it, they even sent a letter saying, we're going to incorporate this chart in all the other manuals around the world. But they didn't. And they had amended and revised and amended the manuals many times over the course of the years, leading up to the time that my client was flying the airplane, but the chart was never included. And therein lies the breach of the warranty. The information wasn't there. Shall I go on or shall I stop? Well, I thought the chart wasn't there, but the instructions saying measure the center of gravity and how to set it was there without a chart. It was found to be vague, defective. If you'll note, in every jury verdict answer in the special verdict, they found DASO at fault, negligent, defective, et cetera. There were various technical reasons why the tort causes of action were not upheld, the economic loss rule, the sophisticated user rule. Those rules were there. But when it came to the express warranty, the specific questions that were asked in the verdict form specifically say that the warranty was breached, the information wasn't there, and, in fact, and that there was reliance and that the express warranty had been breached. So, obviously, we have an express warranty as an ultimate possibility. But our job is to determine whether that's supported by the record. I'm sorry, say that again? Our job is to determine whether that's supported by the record. That's why we're asking these questions. That's why I'm surprised that you came to court today without any evidence, without any of your excerpts. But you are out of time right now. We may give you a little time for rebuttal when we hear from the other side. Thank you, Judge Kuczynski. Thank you. Excuse me. May it please the Court, Hugh Griffin. On behalf of the Defendant Appellee's Cross Appellant's DESO, Falcon Jet and DESO Aviation, Judge Gould brought up the site, and I have the site right here. It's A-S-E-R-1-1-1. You're right. The testimony was undisputed that Captain Michael said he never computed the CG. And so there was testimony by witnesses, well, that makes the chart useless. You've got to know the CT. So what was his answer to that? His answer was, and this is at A-S-R-E-1-1-1, well, because I had all that fuel in there, I knew I was at the forward link. That's what he said. So now that, in our view, even more destroys the reliance issue and any evidence of any reliance. Because the manual, what did the manual tell him? The manual said, take off trim, bring the airplane, bring the tailplane back into the green takeoff band, and that's in Evidence Exhibit 169 S-E-R-3-2-7. And everybody testified that there's a green band here. It's not green on my picture. You're pointing to something in your hand. Where is that? That is at S-E-R-3-2-7. We've got, like, four sets of excerpts here, and that's Exhibit 169. Okay, 3-2-7. This is an actual photograph of the course of the control panel? Horizontal stabilizer control indicator. That's a picture of it. That's the vertical bar on the right-hand side? Right. And what this shows is that he actually had it at 5.5, which is where you set it if you have an aft center of gravity, and now you're actually putting pressure underneath the tail and going to keep the nose down even more. But you got to the point of what's the manual? What did the manual tell him? The manual said, bring it back into the green band. And where are you reading from now? I am now reading from AER 174. That's the Operating Procedures Manual. AER being appellants, I suppose. What page? 174. This is the instruction that's in our manual. And what it says is, bring the tail plane, which is the indicator, into the green takeoff band by using the control wheel to the appropriate position, which depends on the airplane's CG, e.g., a forward if the airplane has a forward-located CG. I'm sorry, the page you cited has something about emergency storage. I've got OO-174 on here. OO-174 of appellants, Excel's Record, right? Yes. Volume 1. At the very top it says, Mystere Falcon 900 Operating Manual. That's it. We've got it. Oh, I see. It says takeoff trim. This is at the very top. Okay. Right. And so he was saying, well, gee, he didn't give me the chart. Okay, I didn't compute the CG, but I knew, but now he's saying, I knew at that site we just looked at that it was toward the forward limit. Well, he didn't need the chart if he knew it was toward the forward limit, because he knows it has to be in the green band, and the forward limit of the green band is around 7 or 7.5, and that's exactly where it should have been to lift the tail, to give him some lift on that nose when he went to rotate. Now, why couldn't the jury conclude that if there was a chart and if the chart was provided in the English version of the plane, that its omission from here was a defective, was a breach of the warranty? Because he knew everything the chart could have told him. The chart wouldn't tell him any more than what he already knew. Yeah, but the warranty says something different. I mean, we have to look at what the warranty represents to determine whether there was a breach of the warranty, not whether. . . Right, and the warranty said this contains the information necessary for operation of the airplane. That's the warranty language that he's relying on. Why couldn't the jury infer from the absence of the chart and the other information that was included in the manual in the U.K. and missing in the manual in the United States was missing the information necessary for operation of the plane? Again, because he had the information the chart would have given him, which would have said, hey, if you're at the forward limit, then you've got to put it at the forward limit of the green bar. What's the point of having an operation manual if the pilots aren't supposed to rely on it in operating the plane? I mean, if they're supposed to come up with their own knowledge about it. If the pilot had relied on these documents that he had, the accident wouldn't have happened. He would have put the horizontal control stabilizer in the forward limit position because he said, I knew I had a forward limit CG. So he had all the information right there in front of him. Well, the problem that I have with that is that the jury found to the contrary. Right. This is my cross-appeal argument. I guess I need to get to my appellee argument, even if there's enough evidence to hold in. And there's another whole defense here, by the way, a whole other defense to the express warranty claim, and that's the whole sophisticated user doctrine. The jury expressly found, and now, of course, looking for that verdict form in front of me, expressly found. It's on 4748, I think. Right. I think it might be finding. I think we all understand the jury found it. It's on 0054. 0054. And there's a finding. Were the pilot's sophisticated users of the aircraft and or the manuals who were aware or should have been aware of the danger in the accident? Which question are you looking at? This is page 53 of the appellant's excerpt. You said 54. 53. Which question number? That would be 22. In fact, if you flip back over to 51 and look at the answer to number 14, the jury said an ordinary consumer would know this. If you know the law of physics, you've got to know that if I've got a fully fueled airplane. Well, we know that's the wrong finding, because I wouldn't know that. I shouldn't. I didn't take physics. And I flew planes, and I didn't know that. Not for very long. But the jury heard, okay, he's got a full airplane. He's over-fueled it. He knows he's at least at the maximum weight, if not over. So now he says, I know I'm at the forward CG. If you aren't, and what does he have to combat that problem? He's got the horizontal stabilizer. Right. The reason that the district court judge rejected that was as a matter of law and said that you provided her with no case that ever showed that the sophisticated user defense was actually a cognizant defense for a breach of an express warranty claim. Right. I think that's the problem with that one. That's, you know, now we're back. That's the Johnson case, which did involve implied warranties, direct liability. But what the court said is there's no duty to instruct or warn a sophisticated user, like these pilots were, of something they know or should have known. It's not assumption of the risk. I don't know how we got into this discussion. He did, and I tried to answer it. Counsel did. It's not assumption of risk. It doesn't, you don't have to prove they actually had the knowledge that day, but they should have, as sophisticated pilots, known that. There's testimony by another one of the pilots. Well, it also goes to reliance, right? If you're a sophisticated user, you don't rely. It also goes to reliance. There was another pilot that testified. Well, at least the reliance you place on the manual is much narrower. Right. And the testimony by the other pilot, Mr. Leone, second defendant, was it's common knowledge in the community that if you're forward on that CG and you haven't put the horizontal stabilizer to help you out, you're going to have a delay before that nose comes up. Well, here he put it at 5.5. It's not only not helping him, but that's an aft CG position. Well, it sounds to me, from looking at the whole thing, is that he went to flight training and he says he was told always put the trim in the middle. That's what he said. The flight company said, you know, take that out. Whatever the truth of that is, it doesn't affect you, right? It doesn't affect, but he goes in with that frame of mind and the question becomes if that's what's driving him, does it matter what the manual says? Well, if you're trying to get millions of dollars from Dassault, it has to matter. That's the only case against us is what our manual says. And what our manual says is, hey, if you've got a forward CG, you've got to put that green band at the forward position. And, of course, he didn't even follow the flight safety. He's at 5.5. 6 is kind of neutral. If you don't stop talking, you're not going to hear the question. I'll tell you what my question is. Most of your argument is going towards, you know, whether Dassault has a complete defense based on lack of reliance or that it wouldn't have mattered in light of the pilot's statement that he knew they were already at, you know, forward limits. However, I'm looking at some testimony. This is at Dassault's supplemental assertive record. Can you lift that up so I can see the page number? 227, 227. And there's an explicit statement, which I think is the pilot's testimony, where the pilot says, and this may not be actually accurate, but this is what he told the jury. He says, had I had this chart, the path that I would have taken would have been much different. You wouldn't be listening to me today. So as I understand it, that's what the pilot testified. If the jury is able to, you know, is allowed to credit what the pilot says, then why isn't there reliance in a case that the manuals or the not having the chart in the manuals made a difference? Because if he had followed what the manual said, if he had just followed what the manual said and given his knowledge that he says, I knew I was at the forward CG, if he had just followed what the manual told him, which is if you know it's forward, then you have to put it in the forward position. And he admitted he knew the green band. He was familiar with it, how it advances, what numbers are the forward position, what numbers are the aft position. So he said that, but you can't come up with reliance from that statement when in fact what he had in front of him would have taken him to that very same result. But what about him testifying, if I had the chart, it would have made a difference. I mean, what do we do with that? I think you have to judge it within the confines of what he had in front of him, which is what he's saying. He's saying we're liable for violating an express warranty. We didn't instruct him properly or warn him properly what to do. That's what he's saying. That's his reason for saying, if I had the chart, we wouldn't be here today. But what we're saying is if he just read the manual, given what he now says he knew that it's a forward CG, if he just read the manual and done what the manual told him to do, the accident wouldn't have happened either. Maybe he's saying the chart would have been much more visible than the manual and this is just one line of text on a page, whereas the chart is sort of a big thing that would have attracted my attention and I would have paid close attention to it. What did he say in that? Well, again, we're being sued for what's in this manual. And it seems to me to say, well, if you'd read that and followed it, you'd have been all right. I could see if we put a picture in there, too. Maybe that would have been better. I don't think that's enough. Well, the judge said the manual wasn't sufficiently clear, and so that's why it's supported. Maybe I'd better get back to trying to just for a moment, if I have it, to saying as an appellee, of course, we're here to support Judge Fairbank on her ruling that if there was enough, we don't think there is, but if there was enough here for an express warranty claim, then following the language of Knight and Daly, that the comparative fault is a flexible doctrine, common sense, the jury may properly consider and evaluate the relative responsibility of the various parties for an injury, whether their responsibility rests on negligence, strict liability, or other theories of responsibility. Right. Counsel, let me ask you a question on that. The chief judge noted earlier, I think in his questions, they were adverting to the idea that there seemed to be no California Supreme Court decision absolutely squarely on point as to whether comparative fault could apply in a breach of express warranty case. I know Judge Wardlaw also mentioned a case she thought was pertinent on that, but I guess my question is, if there's any ambiguity in what the California Supreme Court has said, is there a reason why we should not certify the question to the state Supreme Court of whether comparative fault applies in the case of a breach of express warranty, so that court, rather than our panel, can make a decision whether to apply daily or to apply the case that Judge Wardlaw mentioned or make up some whole new rule, because it seems to represent to me at least a matter of policy that normally a state Supreme Court could address. I thought you were going to ask my opponent that question, because he asked for a certification, so obviously that's a decision that there is no California Supreme Court case saying express warranty comparative fault. There's the one sentence in the Schaffer case, but then the Milwaukee Electric case is a case where they actually remanded an express warranty case for trial, even though there was an express warranty. I think there was an implied warranty and a strict liability. The argument was, hey, how about assumption of the risk? And the Court said that's been merged into comparative fault as well, even knowing assumption of risk is now part of that. So we're remanding that. But that's a court of appeal case. No, there isn't. I guess I don't know how to advise you on that, except it certainly wouldn't be inappropriate because there isn't a clear, definite answer. I'd like to address Kransko, though, for just a minute. It was cited in a footnote, and on page 36 of our brief we've dealt with it quite a bit in footnote fashion. But I was tangentially involved in that case, actually way back in the trial court in Milwaukee or Green Bay. But what the court there is holding is that, well, we're not going to apply comparative fault to your litigation, bad faith conduct, because that's what resulted in a higher award. Because that's what we insure you for. No, wait. Well, my understanding is that the ‑‑ because the insurance is a contract, and so the duties for the insurer breaches the duty of ‑‑ the implied duty of good faith and fair dealing. That's an actual part of the contractual provision, and that's why there's no comparative fault analysis. But we don't have anything like that here. His contract theory here was just one of four labels that he put on the same thing, which was you didn't give me enough instruction or warning in the manual as to how to handle a forward CG, and you didn't warn me that, hey, if I've got a forward CG and I don't adjust the horizontal stabilizer correctly, there might be a delay. That was his theory of negligence. The instructions just repeated over and over in strict liability. That was his implied warranty theory. That's his express warranty theory. That brings me to a question I have. Is the economic loss doctrine a question of law or a question of fact? Here it was treated as a question of fact. I know it was, but I'm just wondering if that was proper. Well, I mean, I guess the issue to the jury was is the manual integral part of the aircraft. Right, but is that something that the judge should have found before? The reason I'm asking is because it seems as though since the case went forward and all these various theories, it must have been very confusing for the jury and then for them not to know the implications of each of these many, many, many questions and how they interrelated. I mean, the whole thing seems a little confusing to me, actually. But the economic loss applies to those doctrines, so there's no recovery there. But we haven't argued, as he says, as counsel says we've argued, that they're merged now together. No, he got the benefit of the economic loss doctrine. If you find enough evidence here of a breach of warranty and reliance and reject the sophisticated user defense, he's getting the benefit of his warranty theory. He's getting his economic loss, but it's reduced by the fault. Nobody's challenging that finding a 70 percent fault. I mean, there was a lot of evidence beyond what we've been talking about in terms of his mistrim of the airplane and his failure to follow the instructions. He also miscalculated the weight of the airplane. He was like 1,000 pounds too light, didn't consider a lot of the equipment that was on board. There's evidence he didn't put the spoilers on, which is once you know you're going on board, there's a lever you throw the flaps up to try to stop, and there was evidence from the disputed evidence that the experts test something. Our experts said, hey, from what we see of skid marks, he didn't put the spoilers on. So, again, he might have been able to stop before he even got off the runway. So there's a lot of fault. And the CRISPR case also talks about how the California Supreme Court doesn't want all of these theories to be merged together, and that's maybe it wasn't the CRISPR case. It's another case that we shouldn't be merging the tort theories and contract theories of liability, yet some of what's going on here, the comparative fault could also go to reliance. Right, but he got the benefit. If we totally merged them, then the verdict should be zero, but we haven't. So he's got the benefit of that. He got his economic loss, but now we have to look at what the Supreme Court told us about how we're going to view comparative fault, and it's going to be a flexible theory. We're not going to have a droit pleading or selection of theories bar us. There's no policy reason to permit a plaintiff's conduct to escape unexamined or to have that share of plaintiff's damage which flows from his own fault borne by others. And in a case like this, as Judge Fairbank said, there's really no other than the economic loss doctrine which allows him to get something. There wasn't any difference in the evidence and the argument. His own brief says all my theories centered on the manual. It was all really one claim with four labels on it. And in that situation, we think from, again, there's no square case, but our view of what daily and night, the language there and the rationale there, which seemed to us to make it awfully clear that if you're in that kind of case, then that's an appropriate case for comparative fault. Now, there's other kinds of express warranty cases, and, well, we could be making law about those today. I mean, if I tell you I've got a box of widgets here with 20 widgets, and it turns out there's 15, and the argument might be, well, you should have figured that out. I mean, that's a different basis of the bargain case. I don't think whatever we do today affects those cases, but this is an accident. Thank you. Thank you. Brenda Dugay from Chicago. Luckily, I got here Monday. It's just windy. It's blizzard, right? Thank you. Thank you. You're out of time. We'll give you a minute for a butler, if you'd like to take it. Briefly, I want to address two issues. The sophisticated user defense is not applicable in this case against express warranty. There are two later cases which we did not cite in our brief. One came down in November of 2012, which specifically says that the sophisticated user defense does not apply to express liability, et cetera. Pardon me? Did you know about these cases before today? Not today. In preparation, I picked this case up, but there was – I also picked up the fact that – I'm sorry.  A few days ago, I picked up the fact – Did you send a 28-J letter so that opposing counsel could address them? I'm aware of that, Your Honor. Okay. You didn't raise it in your opening argument. You didn't address them. Well, I did, but – You don't give a chance to opposing counsel to speak to these. That's – So I think this is not a proper rebuttal. If you have a 28-J letter, you can file it with the Federal Authority. I can cite, however, a case called Howter v. – which is a Supreme Court case, which we did cite in our record, which also specifically says that the sophisticated user defense only applies to failure to warn. It does not apply to design defect. It does not apply to negligent defect. The other thing that I do want to – I thought failure to warn was the key here. Say again? I thought that was your theory, failure to warn. There was a – No. Warning is not the same thing, and especially the criteria. Sophisticated user is not the same thing as primary assumption of the risk where you actually know that there's a defect. That's precisely this dichotomy, which is clear in all the different cases, where they find this difference between primary and secondary assumption of the risk and how there is a difference between contract remedy of express warranty and tort remedies. And specifically, the sophisticated user defense, which is what I was addressing, is very narrowly limited to a failure to warn. The fact of instruction and the fact of a warranty saying everything's in there and it's not in there is a very different contractual action. If you're a sophisticated user, there's no question that the pilots in this case were highly experienced pilots. But this plane is a very unique airplane. Why did it take two weeks for him to train to learn how to use it? Or if he was so experienced. In fact, the copilot was a 747 captain for 5,000 hours. Every airplane has its unique characteristics. So the general knowledge – What does that have to do with anything? Well, it's – The captain's in charge, right? Of course. The copilot can't just take the yoke and, say, yank it away until the captain turns over control, right? No, but that wasn't my point. My point was – Well, but – What was your point? My point is that there's a vast difference in general knowledge of a sophisticated user of an airplane to know that you can fly an airplane versus what's required in a specific type of aircraft like this to know what's going on and what evidence is unequivocal. I'm sorry. Am I – Do I understand wrong that you have to be type certified in order to fly a commercial aircraft? Well, a jet aircraft, not necessarily commercial, but also private aircraft, jet aircraft, too. I mean, so over a certain size, you have to be type certified. Yes. You can't just be a pilot. You have to be certified by the FAA for that particular craft, and that's true of all crafts over a certain size. That's correct. You have to have training, and you then have to – Checked out by the FAA. Checked out by the FAA and so on. That's correct. Is there anything in the record that suggests that the training period or the certification process for the DeSalt 900 here was different from that of any other craft? Other aircraft, of course. No, it was more onerous or more difficult or anything. I mean, this argument you're making, this was a particularly difficult aircraft. That's not the criteria. Each aircraft has different buttons in different places, systems that are different, ways of handling emergencies, the way in which the aircraft – Did you hear my question? Pardon me? Say again. My question was, is there anything in the record that suggests that type certification for this aircraft is more onerous than other aircraft? No. Okay, thank you. Case just argued. Stand submitted.
judges: Kozinski, Wardlaw, Gould